Filed 9/11/23  P. v. Bass CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANGEL LUIS BASS,<br><br>    Defendant and Appellant. | H049528<br>(Santa Clara County<br>Super. Ct. No. C2007193) |

In 2021, a jury found Angel Luis Bass guilty of numerous charges involving multiple victims, including first-degree murder, assault with a deadly weapon, simple assault, and attempted arson.  The jury also found true allegations that in the commission of an assault with a deadly weapon, Bass inflicted great bodily injury on the victim.  The trial court sentenced Bass to a total term of 25 years to life in state prison consecutive to an additional term of seven years.

On appeal, Bass argues that the jury was improperly instructed as to the use of charged offenses to determine his intent for the murder charges.  He also claims that one of the convictions for misdemeanor assault, a lesser-included offense, was time-barred by the statute of limitations.  Bass further contends we should remand for resentencing based on:  (1) Senate Bill Number 567 (2020-2021 Reg. Sess.) (Senate Bill 567), which amended Penal Code section 1170[1] to limit the trial court's discretion to impose upper term sentences (and was enacted after he was sentenced), and (2) Assembly Bill Number

---

[1] Undesignated statutory references are to the Penal Code.

518 (2020-2022 Reg. Sess.) (Assembly Bill. 518) and its amendments to section 654, which provides the trial courts with newfound discretion to sentence under any count as charged.[2] The Attorney General concedes that the matter may be appropriate for remand pursuant to Senate Bill No. 567 but contests the remaining requests.

For the reasons below, we reverse Bass's conviction of one misdemeanor assault count as time-barred. In all other respects, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Charges, Verdict, and Sentencing

On January 28, 2021, the Santa Clara County District Attorney's Office filed a first amended information charging Bass with the murder of James Milton (§ 187, subd. (a); count 1); assault with a deadly weapon (a nail gun) upon Milton (§ 245, subd. (a)(1); count 2); attempted murder of V.Z.[3] (§§ 664, 187, subd. (a); count 3); assault with a deadly weapon (a machete) upon V.Z. (§ 245, subd. (a)(1); count 4); assault with a deadly weapon (a fire) upon V.Z. (§ 245, subd. (a)(1); count 5); arson (§ 451, subd. (d); count 6); assault with a deadly weapon (a pipe) upon J.L. (§ 245, subd. (a)(1); count 7); assault with a deadly weapon (a stick) upon R.M. (§ 245, subd. (a)(1); count 8); and inflicting corporal injury on a spouse upon S.B. (§ 273.5, subd. (a); counts 9-11). The information also alleged that in the commission of count 2, Bass inflicted great bodily injury on Milton (§§ 12022.7, subd. (a), 1203 subd. (e)(3)).

On April 26, 2021, prior to the commencement of trial, Bass entered a plea of no contest to counts 9 through 11.

---

[2] In his opening brief, Bass also contended that the trial court erred in its oral pronouncement of his sentence for first degree murder. However, in his reply, Bass found the record adequate to reflect the proper sentence and withdrew this issue from consideration on appeal.

[3] Apart from the deceased, we refer to the victims in the proceedings by their initials only to protect their personal privacy interests pursuant to California Rules of Court, rule 8.90(b)(4),(b)(10).

On May 18, 2021, the jury convicted Bass of murder (count 1), assault with a deadly weapon, a nail gun (count 2), the lesser-included misdemeanor offense of simple assault (count 4), assault with a deadly weapon, a fire (count 5), the lesser-included offense of attempted arson (count 6), and the lesser-included misdemeanor offense of simple assault (count 8). The jury found Bass not guilty of attempted murder (count 3), assault with a deadly weapon, a machete (count 4), arson (count 6), and assault with a deadly weapon, a stick (count 8.) The jury also found true the allegation that Bass inflicted great bodily injury in the commission of count 2. The jury was unable to reach a decision on the assault with a deadly weapon in count 7, and the trial court declared a mistrial.[4]

On September 30, 2021, the trial court sentenced Bass to 25 years to life in state prison for murder (count 1). The court also imposed a consecutive term of seven years, consisting of the upper term of four years for assault with a deadly weapon (count 5), and three consecutive terms of one year (one-third the midterm of three years) for corporal injury on a spouse (counts 9, 10, and 11). The court additionally imposed two concurrent terms of six months each in county jail for misdemeanor assault (counts 4 and 8).

Pursuant to section 654, the court imposed and stayed the following terms: (1) an upper term of four years on assault with a deadly weapon plus three years for the infliction of great bodily injury (count 2); and (2) the upper term of three years on attempted arson (count 6).

Bass timely appealed.

---

[4] The prosecution subsequently dismissed this count in the interest of justice on May 19, 2021.

### B. Factual Background

#### 1. Prosecution's Case

#### a. Assault and Death of James Milton (Counts 1 and 2)

On May 11, 2020, San Jose Fire Department Captain Michael Butler responded to a report of a fire in a homeless encampment near Senter Road in San Jose. Upon his arrival, Butler observed what appeared to be a large rope or a clothesline between two trees with blankets thrown over them. As Butler could see the fire from behind the blankets, he grabbed a hand tool to chop down the clothesline in order to get a hose line in place towards the fire. Upon chopping down the line and getting a clear view of the scene, Butler discovered a person, later identified as James Milton, whose lower body was on fire. After extinguishing the fire, Butler observed that Milton was still alive but had extensive injuries on his face consistent with being hit repeatedly with a blunt object. Butler also observed numerous burn injuries to Milton's lower body.

Grant Widmer, a detective for the San Jose Police Department, also responded to the fire after receiving a report that Milton had been located at the scene with multiple injuries. As Milton was being loaded into an ambulance, Widmer was approached by Bass, who wished to make a statement. Widmer recorded Bass's statement on his body-worn camera. Bass stated that Milton, who did not live in the encampment, came over with a nail gun and tried to attack him. Bass grabbed the gun from Milton and asked him what he was doing, then "smacked" him with it. He then aimed the gun at Milton's butt and pressed it, causing a nail to go into Milton's tailbone. Bass noted that Milton did not end up doing anything to him with the nail gun. Bass also stated that he knew Milton "from Monterey Road." Bass claimed the incident had taken place approximately two hours before, and he had been waiting there for the police to show up. Bass stated that

4

during this time, he had been "attending" Milton and poured water on him to "wake [him] up." Bass denied any knowledge of the fire.

Marco Sousa, a San Jose Police Department officer, responded to the scene at the request of the fire department. Upon arriving and noticing the injuries on Milton's face and lower body, Sousa investigated the fire location, where he observed a burn area right outside a large tent. Sousa noticed blood on top of some articles of clothing "a few paces" away from the burn area. Sousa collected a nail gun and a hammer approximately five to six feet from the blood-spattered items. Sousa noted that the nail gun was heavy-duty and is used to anchor things into concrete surfaces.

Santa Clara County Crime Laboratory Criminalist Michelle Bell performed a DNA analysis of swabs taken from the nail gun and the hammer. She concluded there was a match to Milton to a high degree of certainty but was unable to conclude there was a match to Bass.

Mike Afshar, an arson investigator for the San Jose Fire Department, was called to the scene to investigate the origin and cause of the fire. Afshar explained that when conducting an arson investigation, he first looks for the area where the fire started and then examines the area for potential ignition sources. Upon arriving at the scene, Afshar observed the main burn area to be approximately 10 foot by 15 foot. Afshar next investigated the area where Milton was found, which was approximately 20 feet away from the main burn area. Afshar did not notice the smell of any ignitable liquids in the area.

Afshar collected samples of soil from inside the burn areas as well as the unburned areas around the main burn site in order to test them for the presence of ignitable liquids. He obtained Bass's shoes and belt, as well as Milton's shoes and clothing, to be tested for ignitable liquids. Subsequent testing demonstrated the presence of light petroleum

5

distillate, an ignitable substance, on Milton's shoes and clothing as well as on Bass's shoes. No ignitable liquids were found in the soil from the burned and unburned areas.

Based on these results, Afshar concluded that the fire was incendiary, which he defined as "a fire [ ] deliberately set with the intent for the fire to occur where it should not normally occur." He also determined that the area of origin was within the original burn area. In addition, Afshar concluded that the light petroleum distillate had most likely been poured deliberately on Milton's shoes and clothing, as well as on Bass's shoes. Afshar reached this conclusion based on a number of factors: (1) the distillate was not inherent to the items of clothing in which it was discovered;[5] (2) it was unlikely that the distillate had been spilled accidentally based on its normal packaging and the fact that none was found in the burn area or surrounding soil; and (3) the distillate evaporates quickly in open air, therefore making it unlikely that it had been spilled onto the items of clothing days or weeks prior to the fire.

Milton was admitted to the hospital unresponsive with severe traumatic brain injury and thermal injuries. Milton did not recover and remained comatose during his hospitalization, ultimately passing away one month later.

Dr. Michelle Jorden, the chief medical examiner who performed Milton's autopsy, documented various injuries during her examination. Dr. Jorden observed numerous "full-thickness" skin burns on both of Milton's arms. She also observed a number of hypopigmented scars, lighter in color than Milton's normal skin color, adjacent to the burns. Dr. Jorden noted that Milton had a scalp laceration that had previously been stapled at the hospital. Milton also had a scalp impression with an abrasion, a possible result from his long hospitalization. Milton had several other abrasions and scars on his face and body, but Dr. Jorden could not determine if these scars were from recent or past injuries. However, she concluded that the stapled scalp laceration had resulted from a

---

[5] Afshar indicated that examples of light petroleum distillate generally include cigarette lighter fluid, a liquid camping fuel, or a hand warming gel liquid.

recent blunt force injury, as it was strong enough to tear the scalp open and had to be treated during the course of Milton's hospital stay to prevent bleeding. Milton also had numerous full-thickness skin burns on his thighs, legs, and buttocks, which Dr. Jorden described as "severe," third to fourth degree burns covering thirty percent of his body Based on the appearance of the burns, Dr. Jorden was able to determine that they were more recent injuries.

Dr. Jorden also performed an internal examination of Milton's body, where she observed numerous areas of bleeding directly under the scalp's surface and subgaleal bleeding which extended deeper beyond the scalp. Dr. Jorden confirmed these injuries were consistent with severe head trauma, which correlated with Milton's initial admission for traumatic brain injury. Milton also had an open wound to his eye, which was bleeding into his eye and contained foreign material. Dr. Jorden indicated that this injury was consistent with a direct blow to the left eye, which fractured the eye socket and many of the surrounding bones, and noted that such a blow could have been sufficient to cause traumatic brain injury and death.

Based on her examination, Dr. Jorden concluded that the cause of death was the combination of blunt force trauma to Milton's head and his thermal injuries. While Milton had a good to moderate chance of recovering from the burn injuries, Dr. Jorden noted that his brain injury was severe from the time of admission itself, which rendered him unconscious for his entire hospitalization until his death. Milton also had pneumonia in his lungs, which resulted from his higher risk of infection due to both the brain injury and burn injuries. While Dr. Jorden noted that hypothetically, either the burns or the brain injury, standing alone, could have caused Milton's death, the brain injury was the more likely cause because of its severity and Milton's comatose state following infliction of the injuries. However, given the interplay between both the

injuries, Dr. Jorden could not separate out only one as the direct cause of death and therefore concluded it was the combination of the two that resulted in Milton's death.

### b. Assault on V.Z. (Counts 3 thru 6)

V.Z., who testified in custody under a use immunity agreement, indicated that he knew Bass, nicknamed "Boricua," from living together in the same homeless encampment called "The Jungle." V.Z. testified that on August 9, 2019, he was arrested by police in the Coyote Creek area for trespassing. At that time, V.Z. informed the police that approximately one week earlier, he had been attacked by Bass, although he had not reported it to the police when the attack occurred. V.Z. testified that Bass approached him and asked him to go somewhere, and proceeded to take him to an area with an altar containing skulls, the virgin, and other stuff that V.Z. described as "ugly." Bass then became upset about a tattoo on V.Z.'s arm of a woman, whom Bass believed was his (Bass's) wife. When V.Z. told Bass the tattoo was not of his wife, Bass laughed, pointed to a nearby picture of saint figures, and told him to "say [his] goodbyes." Bass then began hitting V.Z. with the blunt end of a machete.

Bass and V.Z. then approached an area with bicycles, where Bass began hitting him in the back and neck with a bike frame. Bass then poured gasoline over V.Z. and rubbed him with an itchy plant soaked in gasoline that V.Z. believed to be ivy. V.Z. testified that as Bass was pouring gasoline on him, he stated that "all the people who [ ] messed with [Bass's] wife would end up like this" and told V.Z. to "say [his] last goodbyes to Jesus, God, and the Virgin." Bass then used a lighter to set V.Z. on fire. V.Z. ran into a nearby creek to extinguish the fire and tore away his clothes in the process.

V.Z. indicated that the worst burns were to the top of his head, but he suffered injuries on other parts of his body as well. V.Z. chose not to go to the hospital for treatment because he was afraid Bass might find out and hurt him. V.Z. indicated that

8

when he was arrested by the police 10 days later, the burns on his shoulder and neck had healed and were no longer visible.

San Jose Police Officer Thomas Ortiz testified that he had detained V.Z. on August 9, 2019, for trespassing in the Coyote Creek area. He confirmed that V.Z. told him and the other officers about the previous week's attack and positively identified Bass as his attacker from a booking photo. Ortiz also observed scabbing on V.Z.'s right shoulder and a palm-sized injury on V.Z.'s head, which V.Z. indicated was from the fire.

### c. *Assault on J.L. (Count 7)*

J.L., who also testified in custody under a use immunity agreement, stated that "Boricua"[6] had approached him while he was visiting a friend and told him he did not want to see him in the area again. Boricua then grabbed a heavy metal pipe from a car and hit both of J.L.'s legs approximately 10 to 12 times, while yelling that he was going to kill J.L. J.L. testified that Boricua broke the bones in his legs and left him in a wheelchair for approximately three to four months. J.L. further testified that he was the target of "Tuten," an organization within the satanic church in San Francisco, and that Tuten had threatened to kill him in the past. J.L. stated that Tuten had attempted to brainwash him with chloroform, and members of Tuten attacked him while he was in the hospital recovering from the attack.

J.L. believed that "Boricua" worked for Tuten and had been sent by them to kill him. J.L. identified Bass as "Boricua" in a photo lineup and positively identified him in court as his attacker.

J.L. confirmed that upon his admission to the hospital, he tested positive for numerous drugs, including cocaine, benzodiazepines, and methamphetamine, though he denied using any drugs on the day of the attack. J.L. also testified that he had been

---

[6] J.L. subsequently testified that he only knew Bass by the name of "Boricua," which "everyone" called him.

9

arrested one week prior because he had allegedly started a fire, but he did not recall doing this.

### d. *Assault on R.M. (Count 8)*

R.M., a resident of the local homeless camps, testified that Bass had attacked him several times in the past. R.M. stated that in September 2017, someone threw an object at his tent. When R.M. came out to investigate, he saw Bass standing in front of the tent with a big stick in his hand. Bass began swinging the stick at R.M. and hitting him, causing R.M. to fall down into the bushes nearby. As R.M. ran away calling for help, a friend came by holding a homemade sword. Bass grabbed the sword and started chasing R.M. around a car, yelling that he was going to kill him.

R.M. testified that on a different occasion, Bass approached him while he was washing clothes, hit him in the back with a shovel, and proceeded to kick him numerous times "like [he] was a soccer ball." In another incident, Bass ran up to R.M. and asked him where Bass's wife was located. After R.M. indicated he did not know where she was, he turned around and saw Bass's wife nearby. Bass then hit R.M. three times and "busted" R.M.'s tooth and ear. R.M. indicated that while all three incidents happened at different dates and times, they were all "pretty [ ] close" to each other, and he reported the incidents to the police.

R.M. also testified that a few days after the September 2017 incident involving the large stick, Bass had threatened to hurt him if he testified, and told him he would destroy all of R.M.'s property and set it on fire. While R.M. did not think anything of this threat, he subsequently heard the fire department approaching and saw both of his carts in the

10

encampment on fire. After the fire department put out the fire, one of the carts had melted to the ground.

San Jose Police Officer Clare Johnson confirmed that she had responded to the scene after R.M. reported the September 2017 incident, and observed abrasions on R.M.'s leg and wrist.

### e. Testimony of S.B. (Counts 9 thru 11)

S.B. indicated that she and Bass had been married for 13 years, and that the couple had been homeless for certain periods during their marriage. S.B. testified that Bass had burned down their tent approximately four to five times, with three of these incidents occurring after she told him she no longer wanted to live with him. S.B. indicated that one such incident occurred after Bass had been away from the tent for numerous days, during which time she suspected he was with another woman. Upon his return, S.B. told him that if he was not going to be there, she did not want to live in the tent and would rather go stay with her children. Bass subsequently burned down the tent while she was inside. S.B. was uncomfortable testifying against Bass, as she loved him and felt he was right to burn down the tent if they were not going to be living in it together. She also believed he was just watching out for her and had saved her life while living in the encampment.

S.B. testified that on approximately 50 occasions, Bass had attacked various people. These attacks were often the result of Bass's belief that these individuals had been with S.B. or bothered her at some point in time. S.B. also believed Bass tried to "keep things in line" at the encampment by first talking to people, then beating them up if they did not "seem right."

S.B. additionally testified that Bass would often become paranoid about people coming to "get" them. On one occasion, he locked her and himself in a structure to make sure no one was coming. Bass also would get angry if she and others did not obey him, and occasionally locked her in a "hole" covered with plywood to keep her out of trouble.

11

Bass also would yell at S.B. and become violent with her for not listening to him. This would include slamming her to the ground, as well as pushing, choking, and slapping her. S.B. testified that Bass had choked her on numerous occasions and frequently choked her hard enough to make her lose consciousness.

### 2. Defense's Case

#### a. Milton's Cause of Death

Dr. Michael Laufer, a trauma surgeon, testified regarding Milton's cause of death. Dr. Laufer indicated that based on his review of Milton's documented injuries and the effects they had on him over the course of his hospitalization, he did not agree with Dr. Jorden that complications from Milton's numerous injuries were the cause of his death. Dr. Laufer stated that he believed it was the infections, namely, the pneumonia in Milton's lungs, that caused Milton's death. Dr. Laufer also concluded that the pneumonia was "tertiary" to Milton's burn injuries as the injuries required him to undergo multiple surgeries and be on a ventilator, which resulted in multiple infections and pneumonia. Dr. Laufer further noted that he was not a forensic pathologist or medical examiner. He also indicated that while he considered all of Milton's medical records in rendering his opinion, he was only asked to consider whether Milton's facial injuries were sufficient to cause disfigurement or death, and he did not render an opinion on the injuries to other parts of Milton's body or his burn injuries.

#### b. Evidence of Intoxication

The parties stipulated that on the night of May 11, 2020, Bass tested positive for methamphetamine and had a blood alcohol level of 0.104.

Dr. Laufer, who was also qualified as an expert on the signs, symptoms, and treatment of methamphetamine use, testified that someone under the influence of methamphetamine may display paranoia or appear schizophrenic. Dr. Laufer noted that it would often be difficult to distinguish methamphetamine signs and symptoms from actual psychiatric illness because someone under the influence would appear "psychotic and

schizophrenic, paranoid, delusional, believing that certain objects, including televisions or radios, have special meanings for them, special messages for them." Dr. Laufer further stated that approximately 40 percent of chronic methamphetamine users displayed these paranoid signs and symptoms.

S.B., who was also called as a defense witness, additionally testified that Bass had used methamphetamine approximately three to four times a week throughout their marriage, but she did not observe this had a significant effect on his behavior or necessarily caused his paranoia.

## II.    DISCUSSION

### A.  Instructional Error

Bass contends that the trial court committed instructional error. Bass claims that the trial court erred in instructing the jury that it could consider the charged offenses against R.M., J.L., and V.Z. in determining Bass's intent to murder Milton if the jury determined the offenses had been proved by a preponderance of the evidence. Bass claims that the instruction effectively lowered the prosecution's burden of proving guilt on the other charged offenses beyond a reasonable doubt, which violated Bass's due process rights. Bass also argues that the instruction, which discussed two different standards of proof, improperly confused the jury and prejudiced him. Bass further argues that this instruction was structural error and, in any event, the error mandates reversal under any applicable standard.

For the reasons discussed below, we find no error in the challenged instruction. Further, even if we assume error, we determine that such error was harmless.

### 1.  Background

Before trial, the prosecution filed a motion in limine seeking to introduce evidence under Evidence Code section 1101, subdivision (b) of ten uncharged offenses demonstrating Bass's violent interactions with other homeless individuals, including seven other incidents involving R.M. and one other incident involving S.B. The

13

prosecution indicated that these offenses were admissible to show Bass's intent to deliberately set Milton on fire and disprove a claim of self-defense or mistake. At the same time, defense counsel filed a motion to sever the counts as to each individual victim, arguing that each count "bolstered" the other such that he would be unfairly prejudiced by a single trial on all counts. Defense counsel also objected to the admission of uncharged offenses.

In a written decision, the trial court denied the motion to sever, indicating that (1) the charged crimes were all assaultive and therefore met the requirements for joinder under section 954; (2) evidence of each crime would be cross-admissible under section 1101, subdivision (b), to demonstrate lack of self-defense or accident, or intent; and (3) Bass failed to demonstrate that the charges, specifically those in counts 9 through 11 for corporal injury on a spouse, were "so inflammatory" as to require severance.

The trial court also granted the prosecution's request to introduce evidence of eight of the ten uncharged offenses, which included all of the offenses involving R.M. and S.B., under Evidence Code section 1101, subdivision (b), for the purpose of demonstrating Bass's intent. The trial court found that the probative value of the uncharged conduct reflecting Bass's intent outweighed any potential undue prejudice, confusion of issues, or misleading of the jury, and would not cause any unnecessary delay, particularly since R.M. and S.B. would already be testifying regarding the charged offenses.

### 2. *The Challenged Instruction*

Prior to instructing the jury and outside of the jury's presence, the trial court discussed the jury instructions with counsel, provided them with a copy of the final instructions, and asked counsel if there were any objections or request for modifications. The record does not reflect defense counsel objected to the challenged instruction prior to it being read to the jury.

14

At the conclusion of evidence, the court instructed the jury as follows with regards to evidence of charged offenses:[7]

"The People presented evidence that the defendant committed the crimes of attempted murder of [V.Z.]; assault with a deadly weapon, a machete, against [V.Z.]; assault with a deadly weapon, fire, against [V.Z.]; arson; assault with a deadly weapon, a pipe, against [J.L.]; and assault with a deadly weapon, a stick, against [R.M.]  These crimes are defined for you in the instruction for these crimes.  [¶]  You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the charged acts.

"Proof by a preponderance of the evidence is defined elsewhere.  It's what I just defined in the prior instruction.  If the People have not met this burden, you must disregard this evidence entirely.

"If you find by a preponderance of the evidence that defendant committed one of these charged offenses, you may, but are not required to, consider that evidence for the purpose of deciding whether the defendant acted with required specific intent or mental state to be guilty of the murder of James Milton, whether he acted in lawful self-defense or in the unreasonable but mistaken belief in the need for self-defense during that incident, and whether his alleged actions were the result of mistake or accident.

"In evaluating this evidence, consider the similarity or lack of similarity between the charged offenses.  [¶]  If you conclude by a preponderance of the evidence that the

---

[7] This instruction, as noted by the Attorney General, was a modified version of CALCRIM No. 375, which allows the jury to consider evidence of uncharged offenses, if proven by a preponderance of the evidence, for specified limited purposes, including intent.  Notably, the trial court did instruct the jury with CALCRIM No. 375 with regards to Bass's uncharged conduct for the limited purpose of determining his intent to commit the charged offenses.

15

defendant committed one or more of the above-listed charged offenses, that conclusion is only one factor to consider along with all the other evidence.

"It is not sufficient by itself to prove the defendant is guilty of another charged offense. The People must still prove each element of every charge beyond a reasonable doubt."

After deliberations began, the jury submitted the following question to the trial court: "If we find by a preponderance of the evidence that the defendant committed one of the charged offenses, may we consider that evidence for the purpose of deciding any of the charges not just the murder[?]" The trial court answered the jury's question as follows: "If you decide that the defendant committed any of the charged offenses you may, but are not required to, consider that evidence for the limited purpose of deciding whether the defendant acted with the intent required to prove any of the charged offenses, not just the murder."

### 3. *General Principles and Standard of Review*

As a threshold matter, the Attorney General argues that Bass forfeited his claim of instructional error by failing to object to the instruction at trial. However, because Bass contends the challenged instruction was an incorrect statement of law and affected his substantial rights, we decide that we can consider the merits of his claim in spite of his failure to object below. (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312.)

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) We consider the instructions as a whole and " 'assume that jurors are

intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*Ibid*.)

### 4. *No Error in the Challenged Instruction*

In making his argument, Bass primarily relies on *People v. Jones* (2018) 28 Cal.App.5th 316 (*Jones*). In *Jones*, the court reviewed a similar instruction regarding the jury's consideration of five auto burglaries, which were also charged offenses in the case, for the purposes of establishing identity as to all of the alleged offenses and intent as to the alleged offense of theft. The *Jones* court found that, as a general matter, such an instruction was permissible under Evidence Code section 1101, subdivision (b), which allows for the introduction of evidence regarding other criminal activity for the limited purposes of demonstrating identity, intent, knowledge, and other specified nonpropensity purposes. (*Jones*, *supra*, at pp. 328-330.) The *Jones* court also did not find that the instruction had the effect of lowering the prosecution's burden of proof because it did not allow the jury to use the evidence of the auto burglaries to directly infer that the defendant had committed the other charged offenses and concluded with an admonition that every charge of each offense needed to be proven beyond a reasonable doubt. (*Id*. at p. 330.)

However, the *Jones* court found that the particular instruction given in that case was flawed because it asked the jury to apply two different standards of proof to the same crimes, which could lead to confusion. (*Jones*, *supra*, 28 Cal.App.5th at p. 331.) The court also described the instruction as imprecise because it instructed the jury they could only consider the evidence of the other charged offenses for the limited purpose of determining identity or intent, which "[made] no sense" because the jury would necessarily need to consider the same evidence to determine if the defendant was guilty of each charged offense. (*Ibid*.) Citing the similarities between the instructions in *Jones* and those in the instant case, Bass claims that the instruction above was similarly confusing in its discussion of two standards of proof and risked the possibility of jurors

17

"bootstrapping" verdicts by using its verdict on some counts to conclude Bass committed the offenses in other counts.

We disagree. Notably, the one difference between the instruction here and that in *Jones* is that the instant instruction did not contain language limiting the jury's consideration of the charged offenses to a determination of intent. Accordingly, the impreciseness of the instruction, as noted in *Jones*, was eliminated.

Further, Bass's concerns about the improper use of the other charged crimes as evidence without the prosecutor having first proved the crimes beyond a reasonable doubt materialize only if the jury expressly disregarded the remainder of the trial court's instructions. The jury was instructed that "[y]ou must decide what the facts are," "the People [must] prove a defendant guilty beyond a reasonable doubt," and "[w]henever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." The jury also received instructions for each charged offense and for self-defense, all of which emphasized the prosecution's burden to prove, or in the case of self-defense, disprove all elements beyond a reasonable doubt. Thus, before the jury could consider evidence that Bass had committed the murder of Milton when examining the arson and assaults on the other alleged victims, or vice versa, the jury would first need to decide beyond a reasonable doubt whether the underlying facts were true—that Bass had committed the murder and assaults in the first place.

Bass further argues that the prosecution "exploited" the error in the instruction by shaping its entire closing argument around the "51 to 49% nature" of the preponderance standard with a " 'what are the chances' " theme. Specifically, Bass claims that the prosecution's argument served to instruct the jury that they could determine guilt based on probabilities as opposed to beyond a reasonable doubt.

Our review of the prosecution's closing argument demonstrates that the prosecution was referring to the doctrine of chances, which applies to offenses admitted under Evidence Code section 1101, subdivision (b) for the purposes of proving intent.

18

(See *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1017.) Under this doctrine, an act may be relevant " 'to prove intent "as a generic notion of criminal volition or willfulness, including the various non-innocent mental states accompanying different criminal acts." ' " (*Ibid*.) Further, we find no indication that the prosecution's reference to this doctrine was an attempt to reduce the burden of proof. The prosecution's argument of "what are the chances" never referred to a 51%-49% probability but instead solely focused on the unlikelihood that Bass was truly acting in self-defense during all of the incidents at issue.

Finally, even assuming instructional error, we find that such error is harmless. " 'Generally, California appellate courts apply either one of two standards for assessing harmless error: (1) the *Chapman* test (harmless beyond a reasonable doubt)[8]; and (2) the *Watson* test (a reasonable probability the error was harmless).[9] The more stringent *Chapman* test applies in cases where federal constitutional errors are made; the less stringent *Watson* test applies in other cases.' " (*Jones*, *supra*, 28 Cal.App.5th at p. 332.) Here, because Bass claims that the error impermissibly shifted or lowered the burden of proof for an element of the murder charge, we find the *Chapman* test applicable. (See *Rose v. Clark* (1986) 478 U.S. 570, 570-581.)

Given the substantial similarity between the instruction here and that in *Jones*, we find *Jones* particularly instructive in assessing harmless error under the *Chapman* test. In *Jones*, the court cited a number of factors that demonstrated the error was harmless. First, the challenged instruction specifically indicated that the evidence of the other charged offenses, proven by a preponderance of the evidence, was (1) only one factor to consider; (2) not sufficient in and of itself to prove the defendant was guilty of the other charged

---

[8] This test refers to *Chapman v. California* (1967) 386 U.S. 18, 24, which provides that constitutional error can be held harmless only if the court is able to declare a belief that the error was harmless beyond a reasonable doubt.

[9] This test is derived from *People v. Watson* (1956) 46 Cal.2d 818, 836, which provides that an error is harmless if it appears a different verdict would not otherwise have been probable.

19

offenses; and (3) the prosecution was still required to prove every charge beyond a reasonable doubt.  (*Jones*, *supra*, 28 Cal.App.5th at p. 332.)  Second, the trial court provided the jury with numerous other instructions regarding reasonable doubt, including CALCRIM No. 220 (discussing the presumption of innocence unless proven guilty beyond a reasonable doubt), CALCRIM No. 224 (sufficiency of circumstantial evidence), CALCRIM No. 225 (circumstantial evidence of mental state), and CALCRIM No. 315 (eyewitness identification).  (*Jones*, *supra*, at pp. 332-333.)  Third, the prosecution clearly described in her closing argument the use of the evidence of the five auto burglaries in deciding other charges, which clarified any possible confusion in the instruction regarding the standard of proof.  (*Id*. at p. 333.)  Finally, the evidence against the defendant was particularly strong on each of the charged offenses.  (*Ibid*.)  Based on all of these factors, the *Jones* court found that the instructional error was harmless because it was clear beyond a reasonable doubt that the jury would have reached the same verdict absent the error.  (*Id*. at pp. 332-333.)

In the instant case, the challenged instruction contains similar advisory language regarding the proper consideration of the evidence of charged offenses, including the concluding language that the People were still required to proof every charge beyond a reasonable doubt.  Additionally, as discussed previously, the trial court provided the jury with numerous instructions regarding reasonable doubt.

Further, the prosecution's closing argument demonstrated the appropriate use of the charged offenses, if proven by a preponderance, in evaluating the murder charges against Bass.  The prosecution referred the jury to the challenged instruction and informed them that "if you find by a preponderance of the evidence, which is more likely than not, so 50 percent plus 1, that [V.Z.] was attacked, that [R.M.] was attacked, that [J.L.] was attacked and [Bass] was the perpetrator, you can then consider those in evaluating the homicide of Mr. Milton, specifically in asking:  [d]id Mr. Bass have the

20

intent to kill, was he acting in self-defense, and was the fire an accident or did he intentionally set it to kill Mr. Milton?"

However, Bass argues that the evidence against him was not particularly strong on the charged offenses as the jury found him not guilty on counts 3, 4 and 8, and could not reach a decision regarding count 7. Bass therefore claims that these not guilty verdicts "show the jury could have used charged offenses not proved beyond a reasonable doubt to find [him] guilty of first degree murder" and therefore demonstrated the likelihood of prejudice.

We find such a contention without merit. As discussed above, the other charged offenses could only be used, if proven by a preponderance of the evidence, to demonstrate Bass's intent, lack of self-defense or absence of mistake under Evidence Code section 1101, subdivision (b). However, intent was only one element of the murder charge; the jury still needed to find the rest of the elements of murder proven beyond a reasonable doubt before reaching a verdict of guilty. Further, the charges that Bass was acquitted on were unrelated to Milton's murder as they were separate incidents involving different victims. Accordingly, we reject Bass's theory that the jury's verdicts of not guilty on some charges somehow required them to reach a not guilty verdict on *all* the charges, specifically the murder charge.

Further, the record reflects that the evidence in support of the guilty verdict for the murder of Milton was particularly strong. Bass himself admitted to hitting Milton in the head with the nail gun, which resulted in Milton's brain injury—one of the causes of death identified by Dr. Jorden. Additionally, with respect to the other identified cause of death—Milton's thermal injuries—ignitable liquid was found on Milton's clothing and on both Milton's and Bass's shoes, with no reasonable explanation for how it could have appeared there absent someone deliberately pouring it on. Further, despite Bass's claim that he was unaware of the fire, we find that Bass's statement that he had been with Milton for "two hours" prior to the police's arrival, along with the discovery of Milton's

21

body in close proximity to the fire, provided circumstantial evidence that Bass was responsible for setting Milton on fire. In addition, both V.Z. and S.B. testified regarding Bass's prior use of fire as a means of retaliation against them. Accordingly, after considering the jury instructions as a whole and the evidence presented at trial, we conclude that even if we assume that the trial court erred in giving the challenged instruction, such an error was harmless because it is evident beyond a reasonable doubt that the jury would have still reached the same verdicts.[10]

### B. *Statute of Limitations on Lesser-Included Offense*

Bass next argues that the jury's conviction on count 8 of the lesser-included misdemeanor offense of assault against R.M. under section 240 was time-barred. Bass argues the underlying conduct took place on September 3, 2017, more than one year before the information was filed on January 21, 2021, thus barring the conviction under the one-year statute of limitations for prosecuting misdemeanor offenses.

Under section 802, subdivision (a), prosecution of a misdemeanor offense shall commence within one year of the commission of the offense. In addition, if the initial charge is a felony but the defendant is convicted of a necessarily included misdemeanor, the one-year limitation period for misdemeanor applies. (§ 805, subd. (b); *People v. Mincey* (1992) 2 Cal.4th 408, 435.)

Courts have consistently held that a time-barred misdemeanor conviction is void even if the defendant failed to raise the statute of limitations as a defense in the trial court. (See *People v. Williams* (1999) 21 Cal.4th 335, 338 (*Williams*); *People v. Beasley*

---

[10] Bass also argues that absent the challenged instruction, it was reasonably probable the jury could have found he lacked the intent to commit murder based on his mental disease and voluntary intoxication. However, we find this contention without merit as the jury was separately instructed that it could consider Bass's voluntary intoxication for the limited purpose of determining whether Bass acted with express malice, deliberation, and premeditation. Further, nothing in the challenged instruction prevented or limited the jury from considering evidence of intoxication in evaluating the murder charge.

(2003) 105 Cal.App.4th 1078, 1088-1089 (*Beasley*).)  This applies even if the record is silent as to whether the defendant requested or agreed to the instruction for the lesser-included offense.  (*Beasley, supra,* 105 Cal.App.4th at pp. 1089-1090.)

The Attorney General concedes that the statute of limitation on the lesser-included offense had expired at the time the information was filed.  However, the Attorney General claims that pursuant to *People v. Stanfill* (1999) 76 Cal.App.4th 1137, 1150 (*Stanfill*) a defendant forfeits the right to appeal the conviction of a time-based lesser-included offense if the charged offense was not time-barred, and the defendant "either requested or acquiesced in the giving of instructions for the lesser offense."  As the Attorney General claims the trial court gave counsel multiple opportunities to review the instructions and make objections, Bass's failure to object on the record to the instruction for the lesser-included offense should constitute a forfeiture of this claim.

However, both the Second and Fourth District Court of Appeal have ruled that the holding in *Stanfill* should only apply when there is clear information on the record reflecting that the defendant affirmatively requested or agreed to the instruction for the lesser-included offense.  (*Beasley, supra,* 105 Cal.App.4th at pp. 1089-1090; *People v. Meza* (2019) 38 Cal.App.5th 821, 827-828 (*Meza*).)[11]  In particular, the court in *Meza* noted that the primary concern in *Stanfill* was to prevent gamesmanship by a defendant, who could agree to the lesser-included offense instruction during trial and subsequently raise a statute of limitations argument on appeal since such a claim would not have, under existing law, been waived.  (*Meza, supra,* 38 Cal.App.5th at p. 829.)  However, the *Meza* court also noted that this could allow the prosecution to use inadvertent waivers, where

---

[11] The court in *Meza* also criticized the ruling in *Stanfill*, stating that it essentially provided for a "pure forfeiture" rule, whereby a defendant would forfeit his right to challenge a time-barred conviction by failing to raise it at trial – regardless of the reason, which would contravene established law that a defendant cannot inadvertently forfeit his right to challenge a time-bared conviction on appeal. (*Meza, supra,* 38 Cal.App.5th at p. 827.)  However, we need not decide if the holding in *Stanfill* was incorrect as the facts herein are sufficiently distinguishable such that the holding does not apply.

the defendant simply may not have noticed the statute of limitations issue, to "obtain improper convictions and use forfeiture to protect it on appeal." (*Ibid.*) Accordingly, the *Meza* court declined to extend the holding in *Stanfill* to apply in cases where there was no indication on the record that "[the] defendant made an informed decision to relinquish his right to challenge a conviction for the time-barred lesser included offense on appeal." (*Ibid.*)

We agree that the forfeiture rule as established in *Stanfill* should be applicable only to those cases where the record clearly demonstrates the defendant affirmatively asked for or agreed to the instruction. In the instant case, the record contains no information as to whether Bass requested or agreed to the instruction as all discussions of the jury instructions were held off the record. Accordingly, it would be speculation to conclude that the lack of any objections on the record demonstrates Bass affirmatively requested the instruction for the lesser-included offense or agreed to the specific instruction. Therefore, the holding in *Stanfill* does not apply, and no forfeiture has occurred.

In conclusion, we find that the conviction on count 8 for the lesser-included misdemeanor offense of assault against R.M. was time-barred and reverse the conviction.

### C. Senate Bill 567

Bass argues that he is entitled to remand as a result of Senate Bill. 567's (amendments to section 1170, subdivision (b), which limit the trial court's discretion to impose upper term sentences. The Attorney General concedes that the current version of section 1170, subdivision (b) applies retroactively to Bass's case, but implies that remand may not be required because such an error was harmless. As we explain below, we agree with the Attorney General that any error was harmless because we conclude beyond a reasonable doubt that all the aggravating factors relied on by the trial court would have been found true beyond a reasonable doubt by the jury.

24

### 1. *Background*

At the time of Bass's sentencing, the trial court had broad discretion to determine whether imposing the upper, middle, or lower term " 'best serve[d] the interests of justice.' " (*People v. Lopez* (2022) 78 Cal.App.5th 459, 464 (*Lopez*), quoting former § 1170, subd. (b).) Accordingly, the trial court chose to impose upper term sentences on counts 2, 5 and 6.

At sentencing, after hearing victim impact statements from Milton's relatives and arguments from the prosecution and defense, the trial court noted the vulnerability of the victims, who the court described as "terrified" of Bass and scared to testify. The trial court opined that some of the victims may not have even been willing to testify if not for the fact that they were already in custody. The court also discussed the brutality Bass inflicted on his wife, which she seemed to believe was necessary for her protection, as well as the "terror" he inflicted on the victims, who were not only vulnerable given their homelessness but also much smaller than him in stature. The trial court therefore believed Bass's behavior posed a public safety issue such that imposition of the upper terms on counts 2, 5, and 6 were appropriate.

### 2. *Applicable Law*

Effective January 1, 2022, Senate Bill 567 amended section 1170, subdivision (b) by making the middle term the presumptive sentence for a term of imprisonment absent the existence of certain specified circumstances. (Stats. 2021, ch. 731, § 1.3, adding Pen. Code, § 1170, subd. (b)(1) & (2).) The amended statute now provides that a trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by

the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)

Section 1170, subdivision (b)(4) additionally provides: "The court may consider the record in the case, the probation officer's report, other reports, including reports received pursuant to [s]ection 1203.03, and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing." (§ 1170, subd. (b)(4).) However, section 1170, subdivision (b)(4) does not permit the court to impose an upper term without compliance with section 1170, subdivision (b)(2).

The parties agree that pursuant to *In re Estrada* (1965) 63 Cal.2d 740, Senate Bill 567 applies retroactively to Bass because the judgment is not yet final and there is no indication that the Legislature intended the law's ameliorative changes to operate solely prospectively. We agree. (See *Lopez*, *supra*, 78 Cal.App.5th at p. 465; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038-1039.)

However, the Courts of Appeal are currently split regarding the applicable standard for determining whether there is harmless error when a defendant was sentenced under the former version of section 1170 and the amended version applies retroactively. (See, e.g., *People v. Flores* (2022) 75 Cal.App.5th 495, 500-501 [reviewing court must find beyond a reasonable doubt that jury would have found beyond a reasonable doubt at least one aggravating circumstance true]; *Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11 [harmless error if "reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied"]; *People v. Wandrey* (2022) 80 Cal.App.5th 962, 982, review granted Sept. 28, 2022, S275942 [reviewing court "must ask both whether we can be certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court and whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of

26

the middle term"]; *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1112 [reviewing court must first determine beyond a reasonable doubt that "jury would have found true at least one of the aggravating circumstances that the trial court relied on," and then whether, if the trial court relied on other aggravating circumstances, "it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error"].)  This issue is currently pending before the California Supreme Court.  (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.)

### 3. Analysis

Although the Attorney General concedes that remand may be appropriate, the Attorney General also argues that the trial court's sentence constitutes harmless error because the record reflects the main aggravating factor cited by the trial court – the vulnerability of the victims – was proven beyond a reasonable doubt. [12] We need not decide which standard applies here because we conclude beyond a reasonable doubt that all the aggravating factors relied on by the trial court for counts 2, 5 and 6 would have been found true beyond a reasonable doubt by the jury; accordingly, under any of the standards set forth above, the error was harmless.

Although the trial court did not specifically refer to California Rules of Court, rule 4.421, which details various circumstances in aggravation that can be considered at sentencing, it is apparent from the record that the trial court was, in fact, referring to the rule when discussing the aggravating factors.  The probation report, which the trial court indicated it was relying on in imposing upper term sentences, discussed aggravating factors under California Rules of Court, rule 4.421 at length.  Further, the factors discussed by the trial court, as described above, fall within the specific categories under the rule as follows: (1) the vulnerability of the victims (Cal. Rules of Court, rule

---

[12] Notably, Bass does not discuss the various standards for harmless error and simply claims that the trial court did not refer to any prior convictions or "any other factors" when imposing upper term sentences.

4.421(a)(3)); (2) the brutality and terror Bass inflicted on his victims, indicating that the crimes involved great violence, great bodily harm and other acts disclosing a high degree of cruelty, viciousness, and callousness (Cal. Rules of Court, rule 4.421(a)(1)); and (3) Bass's conduct constituted a threat to public safety, thus reflecting that he had engaged in violent conduct that indicated a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)).

Further, the evidence in the record supports and establishes the aggravating factors that the trial court relied on to impose upper term sentences. First, it is undisputed that the victims were all homeless and that some of them were smaller than Bass, whose height was approximated as 6 feet 4 inches tall, thus indicating that all of the victims were particularly vulnerable. Second, with respect to the assaults against Milton and V.Z., the evidence clearly demonstrated they were violent, brutal confrontations involving Bass not only attacking both victims but deliberately setting them on fire. S.B.'s testimony also reflected that Bass engaged in violent conduct against her, including burning down her tent while she was still inside, repeatedly choking her on multiple occasions until she lost consciousness, and burying her in a hole. Accordingly, because the jury found Bass guilty of the assault on Milton and guilty of both attempted arson and assault on V.Z., there can be no question that it would have found true the first aggravating factor as well, i.e., that the crimes involved great bodily harm "disclosing a high degree of cruelty, viciousness, [and] callousness." (Cal. Rules of Court, rule 4.421(a)(1).) In addition, given the violent nature of these crimes and the number of crimes that the jury found Bass guilty of, it is apparent that the jury would have found true the final aggravating factor that Bass had engaged in violent conduct that indicated a serious danger to society.

In conclusion, based on this record, it is beyond a reasonable doubt that all the aggravating factors relied upon by the court in imposing the upper terms would have been found true beyond a reasonable doubt by the jury. We therefore find that under any

28

prejudice standard the trial court's failure to apply amended section 1170, subdivision (b) was harmless.

### D. Assembly Bill 518

Bass argues that the matter should be remanded based on Assembly Bill 518's amendment to section 654, which gives trial courts additional sentencing discretion. While the Attorney General acknowledges that Assembly Bill 518 applies retroactively to Bass, he argues that remand is not required as Bass would not benefit from the revision to section 654.

Effective January 1, 2022, section 654 was amended by Assembly Bill 518. (Stats. 2021, ch. 441, § 1.)  As amended, section 654, subdivision (a), provides in relevant part, "[a]n act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision."  (Italics added.) Previously, where section 654 applied, the sentencing court was required to impose the term that "provides for the longest potential term of imprisonment" and stay execution of the other term.  (§ 654, former subd. (a).)

Both parties agree that the recent legislative changes to sections 654 apply retroactively to Bass.  We agree.  (See *People v. Mani* (2022) 74 Cal.App.5th 343, 379; *People v. Sek* (2022) 74 Cal.App.5th 657, 673.)

When the trial court sentenced Bass in 2021, it had no discretion to choose which counts to stay under section 654.  (§ 654, former subd. (a).)  As noted above, when a change in the law confers previously unavailable discretion on a trial court, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' "  (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)  When

the record so reflects, "remand would be an idle act." (*People v. Flores* (2020) 9 Cal.5th 371, 432.)

The Attorney General argues that the trial court's comments at sentencing clearly reflect that it would have imposed the same sentence even if it had been aware of its discretion under the current version of section 654. In making this argument, the Attorney General indicates that the trial court made a number of separate sentencing decisions that reflected its intention to not impose a lower sentence as follows: (1) it chose to impose upper terms on counts 2, 5 and 6; (2) it chose to make the term on count 5 consecutive to the 25 years to life term on the murder charge; and (3) it chose to make the terms on counts 9, 10 and 11 consecutive. The Attorney General also points to the trial court's statements about the vulnerability of victims and how they each deserved individual justice, thus explaining its decision to impose consecutive sentences on counts 5, 9, 10 and 11 as opposed to concurrent sentences.

The Attorney General's argument is well-taken. From our review of the record, we find that the trial court's decision to treat each charge individually and impose consecutive sentences, its comments on the victims' collective vulnerability and fear of testifying, and its description of Bass's conduct as amounting to "brutality" and an infliction of "terror" all suggest that the trial court would not have sentenced Bass differently if it had the discretion to do so at the time. We therefore will not remand the matter for resentencing pursuant to section 654 as amended by Assembly Bill No. 518.

### III.   DISPOSITION

The judgment is reversed as to the misdemeanor conviction on count 8, and the sentence as to that count is vacated. In all other respects, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and forward it to the California Department of Corrections and Rehabilitation.

_____
              Wilson, J.


WE CONCUR:




_____
Danner, Acting P.J.




_____
Bromberg, J.




People v. Bass
H049528